Jennifer L. YOUNG, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of Social Security Administration, Defendant.

No. 1:02CV118.

United States District Court,
W.D. North Carolina,
Asheville Division.

Aug. 20, 2003.

Kimberly D. Gasperson–Justice, Hendersonville, NC, for Plaintiff.

Paul B. Taylor, United States Attorney, Asheville, NC, for defendant.

## MEMORANDUM OF DECISION

COGBURN, United States Magistrate Judge.

**THIS MATTER** is before the Court on the parties' cross-motions for summary judgment. Having carefully considered the parties' memoranda of law, the pleadings, the evidence of record, and the applicable law, the Court will deny the parties' motions, reverse the decision of the Commissioner, and remand the matter to the Commissioner for reconsideration.

## FINDINGS AND CONCLUSIONS

### I. Administrative History

Plaintiff, Jennifer L. Young, filed her current application for disability insurance benefits and supplemental security income payments on February 27, 1997, alleging an inability to work beginning June 7, 1990. (R. at 479–82). Plaintiff later changed her alleged onset date to January 1, 1997. (R. at 525). Plaintiff's application was denied initially and upon reconsideration, and on May 26, 1998, an administrative law judge ("ALJ") conducted a hearing on Plaintiff's applications, during which Plaintiff was represented by counsel and presented her testimony as well as that of her mother. (R. at 484, 491, 523–72). On August 20, 1998, the ALJ issued a decision affirming the denial of benefits to Plaintiff. (R. at 19–29). After requesting review by the Appeals Council, on March 2, 2001, Plaintiff submitted, through counsel, a memorandum of law in support of her request for review and additional evidence for consideration by the Appeals Counsel. On March 15, 2002, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner. Plaintiff filed this action challenging the Commissioner's decision on May 10, 2002.

### II. Factual Background

Plaintiff was born on August 22, 1972 and has a high school education and approximately two years of collegiate course work. (R. at 528). Evidence was presented at the hearing that Plaintiff fell off of a roof when she was fifteen-years-old and broke her back, requiring that she wear a brace for approximately three months. (R. at 552). Subsequently, on June 7, 1990, Plaintiff was in a serious automobile accident shortly after she graduated from high school and before she was scheduled to attend college on a music scholarship. (R. at 535). As a result of the accident, Plaintiff was in a coma for four days and hospitalized for approximately ten weeks. (R. at 535). Her injuries included broken jaw bones, crushed teeth, crushed hand, a broken femur, three broken vertebra, a broken hip, and the separation of her pelvis from her spine. (R. at 131, 536). After an extended rehabilitation, Plaintiff matriculated into a community college program, where she obtained a child care certificate. (R. at 537).

According to Plaintiff, following her accident, she worked two summers at Berkeley Mills, where her parents work, spend-

ing one summer as a painter's assistant and one as a secretarial assistant. (R. at 549). Plaintiff testified that after obtaining her child care certificate, she worked in one job as a child care worker but realized that she was unable to pay attention to numerous children at one time. (R. at 538). Plaintiff then returned to the community college where she obtained a certification in the certified nursing assistant ("CNA") program. (R. at 539). Plaintiff testified at her hearing before the ALJ that her memory was not as good following the accident as it had been before the accident, but she managed to get her certificate and worked at approximately four or five rest homes as a CNA, each position lasting less than a month. (R. at 539, 548). According to Plaintiff, she could not maintain that employment because she could not stand on her feet during the long hours that work required, it hurt to sit down, her painful back prevented her from lifting patients and twisting and bending, and she could not remember the order of the duties she was to perform. (R. at 540). Plaintiff testified that she then attempted a series of fast food positions but had difficulty remembering orders and working with customers. (R. at 541).

With respect to her physical limitations, Plaintiff testified that she is not able to walk more than two blocks without sitting down, that her back hurts when she turns or twists, that she can stand on a flat surface for approximately five minutes before her back begins hurting and she has to change position, that she can walk for approximately ten minutes before sitting down or bending forward to relieve her back pain, that she can sit approximately fifteen to twenty minutes, and that she cannot type or grip objects because of her hand injury. (R. at 541–44, 550). Plaintiff also testified that she experiences a form of seizure that puts her in a trance-like state approximately four or five times per day. (R. at 544–46). According to Plain-

tiff, she has only rarely lost consciousness during these seizures, but she falls regularly. (R. at 545). Plaintiff testified that she takes medication for the seizures but still experiences them frequently. (R. at 545–46). Plaintiff testified that she can lift thirty pounds with difficulty a couple of times a day. (R. at 546–47).

Concerning her daily activities, Plaintiff testified that she is able to wash dishes, make her own bed, and fold and put away laundry, and that sometimes she cooks dinner and goes grocery shopping until she needs to sit in the car and rest. (R. at 551). Plaintiff testified that she is not able to sweep or vacuum. (R. at 551).

Plaintiff also presented her mother's testimony at the hearing before the ALJ. According to Grace Ann Young, Plaintiff's mother, Plaintiff lives at home with her and always has. (R. at 554–55). Ms. Young testified that following her accident, Plaintiff attempted to work in many places but that she had difficulty maintaining these jobs because of her inattention to duties and to people around her, frustration, and her inability to remember details. (R. at 555). Ms. Young testified that Plaintiff also got angry with customers and that Plaintiff was asked to leave approximately eighty-five-percent of the jobs she attempted. (R. at 555–56). Ms. Young testified that while Plaintiff managed to gain back her ability to read and write and perform intellectually, following the accident, she was very different emotionally and was being treated by a neuropsychologist. (R. at 556). Specifically, Ms. Young testified that Plaintiff does not get along with anyone for long periods of time, that Plaintiff's mood swings are erratic, that she forgets things frequently, and that she gets highly agitated if there is more than one person in the room with her. (R. at 558). According to Ms. Young, Plaintiff had been to see numerous psychologists,

some of whom had wanted to treat her with "a lot of medication." (R. at 557). Ms. Young also testified that Plaintiff was under the care of a neurologist. (R. at 558). In describing Plaintiff's seizures, or trances, Ms. Young testified that Plaintiff would lose focus as she was talking with Ms. Young, "like she's off in outer space somewhere," or that she would "just be walking along and fall." (R. at 559). Ms. Young noted that Plaintiff had been in a car accident because of a more traditional type of seizure but that since beginning on the medication Tegretol, she had not gone into convulsions, instead losing focus and falling. (R. at 559–60). Ms. Young testified that Plaintiff experiences this lack of focus, or seizure, at least once a day, if not several times a day, and that she falls or stumbles at least one time a day. (R. at 561). Ms. Young also testified that Plaintiff exhibits immature behavior that she did not exhibit before her accident. (R. at 562). Finally, Ms. Young testified that when Plaintiff worked at the mill where she is employed, she was moved from a position in which she worked with machines to a secretarial assistant's position because employees she worked with were concerned about her safety and the safety of other employees. (R. at 563). Ms. Young testified further, in this regard, that when Plaintiff worked as a secretarial assistant, she had to be reminded frequently, and even daily, of her responsibilities and how to complete her tasks and that the mill employed Plaintiff primarily as a way of helping the family. (R. at 563–64).

Finally, at the hearing, Randy L. Adams, a vocational expert, testified. According to Mr. Adams, Plaintiff would be considered a younger individual whose past relevant work would be classified as light, unskilled and medium, semi-skilled. (R. at 565–66). Mr. Adams noted, however, that it did not appear that Plaintiff used these skills in a workplace for a long time in any capacity and that she had no transferrable skills. (R. at 566). The ALJ posed several hypotheticals to Mr. Adams, first asking Mr. Adams to assume a similar profile and background as Plaintiff with her history of physical injuries, resulting in post-traumatic encephalopathy and some seizure disorder, some depression and mood disorder, the residual functional capacity for light, unskilled work with no interaction with the general public on a frequent basis, some difficulty with fine manipulation with her left hand, and unable to work at unprotected heights or with hazardous machinery. (R. at 566–67). In response to this hypothetical, Mr. Adams testified that there would be some clerical positions, considered sedentary, light, and unskilled that Plaintiff could perform in the Buncombe County area. (R. at 567–68). Mr. Adams testified that these limitations would also permit Plaintiff to perform work as a packer, packager, grader, sorter, or inspector. (R. at 568). Mr. Adams was next asked to assume that this person required a sit/stand option, to which Mr. Adams responded that the clerical positions would remain available but the others would not be available. (R. at 568–69). The ALJ then asked Mr. Adams to assume, in addition to the limitations already assumed, that this person also had a moderate to severe difficulty dealing with the usual day-to-day events or stresses and would have difficulty keeping focused on her duties, to which Mr. Adams responded that at that level, she would have difficulty carrying out tasks in a timely manner and maintaining her focus and concentration and that she would not be employable. (R. at 570). Finally, the ALJ asked Mr. Adams to assume the restrictions provided in Dr. Rhodes' report provided on the day of the hearing, and Mr. Adams responded that based on Dr. Rhodes' opinion that Plaintiff experienced undue confusion and frustration even on

relatively simple tasks, Plaintiff would not be able to be employed. (R. at 570–71).

In addition to the oral testimony presented at the hearing, Plaintiff also presented numerous medical and other records for consideration by the Commissioner. For example, included in the record is the Disability Report, submitted by Plaintiff in March of 1997. (R. at 69–103). In this report, Plaintiff stated that she suffered from scar tissue on the right side of her brain, a missing knuckle on her left hand, a left leg that was shorter than her right leg, back problems, seizures, mood swings, and short- and long-term memory loss. (R. at 70). Plaintiff noted in this report that she has lower middle back pain and is unable to stand or sit for long periods of time and that her pain is exacerbated by changes in the weather or riding in a vehicle on a bumpy road. (R. at 92). Plaintiff also stated that she had throbbing headaches for long periods of time that occur several times per month, that she experiences mood swings and has difficulty getting along with other people when she has these headaches, and that her headaches appear to be caused by long periods of concentration. (R. at 94). Plaintiff noted that she has pain in areas of her body where she had broken bones from the accident, including especially her left hand, where she experiences pain during any activity that requires the use of her left hand. (R. at 96). With respect to her functional capacity, Plaintiff reported that she is unable to rake, mop, lift, or climb; that she gets confused in stores and cannot stand on her feet for long periods of time; that she only cooks food that is simple; that she is unable to drive; and that her mother pays all her bills. (R. at 100–01).

Also included in the record is a field office disability report, completed on February 27, 1997 by a field office representative who interviewed Plaintiff concerning her disability. (R. at 65–68). In this report, the interviewer noted that Plaintiff appeared to have difficulty sitting, seeing, concentrating, and understanding and noted specifically that Plaintiff had to stand up several times during the interview and that when she returned from the bathroom, she seemed lost and disoriented. (R. at 67).

Plaintiff also submitted numerous medical reports, beginning with reports from the time of the accident. Of particular note, Plaintiff submitted various IQ tests that had been performed in the years since the accident. In 1990, her verbal IQ was measured as 97, while her performance IQ was measured as 74, generating a full scale IQ of 85. (R. at 238). Because of the large discrepancy between the verbal and performance scales, however, the full scale score was not considered accurately to reflect Plaintiff's overall intellectual functioning. (R. at 238). The neuropsychologist who conducted the testing opined at the time that the data suggested that Plaintiff would have trouble organizing complex activities of daily activity and would need intensive outpatient cognitive rehabilitation in order to enter a four-year college. (R. at 240).

In 1993, Plaintiff's IQ was again tested, this time yielding a verbal score of 104, a performance IQ of 98, and a full scale IQ of 102. (R. at 378–79). This time, Dr. Thomas LaBreche, a neuropsychologist, noted a significant reduction in cognitive ability from her pre-accident performance, but also found that her performance on the memory scale was in the average range. (R. at 377).

Finally, Plaintiff's IQ was tested in May of 1997, at which time her verbal IQ was

measured as 104, her performance IQ was measured as 90, and her full scale IQ as 102. (R. at 166). Dr. Earl Rhodes, a clinical neurologist, stated in his report on May 13, 1997 that Plaintiff's verbal and nonverbal memory were normal for her age and background and that her concentration and attention abilities appeared normal. (R. at 168). Dr. Rhodes also noted, however, that he found some difficulty in concentration with sustained effort over time:

> While we cannot describe severe deficits in the attention/concentration area, I think we are finding here, for some problems that would significantly impair functional abilities with sustained effort and speed of processing. Even with other very good cognitive skills, this type of basic problem is not well compensated for, and can put many individuals at a loss and result in undue confusion and frustration on relatively simple tasks.

(R. at 168–69). Dr. Rhodes also noted that there had been "an exacerbation of some symptoms [since the earlier testing] with continuing right side seizure activity" and increased irritability with a history of depression. (R. at 169). Dr. Rhodes concluded that while Plaintiff's problems in concentration with sustained effort and other "inefficiencies" should not "preclude some form of productive employability," he also noted that when combined with the "emotional components of this case," Plaintiff's deficiencies would "represent the issues to be compensated or managed in order to facilitate a more productive life." (R. at 169, 170). Dr. Rhodes recommended counseling and medication to address Plaintiff's emotional difficulties, as well as vocational rehabilitation to assist in managing some of her cognitive challenges. (R. at 170).

The medical records also include a report from July 14, 1996, when Plaintiff was seen at the hospital and diagnosed as depressed with suicidal impulses. (R. at 174). The physician who evaluated her described her attention as adequate but stated that her focus and concentration were mildly impaired. (R. at 175).

On January 25, 1997, Plaintiff was involved in another automobile accident, and an electroencephalogram indicated a possible seizure. (R. at 178). Additionally, physician notes indicate that Plaintiff apparently had two additional seizures on the way to the hospital and that it was reported that Plaintiff had had additional episodes at home during which she had fallen without unknown reasons. (R. at 185–86). Dr. William Moffitt, Plaintiff's family physician, recommended on March 3, 1997 that Plaintiff continue using her medication to control her seizure activity and to continue school. (R. at 185).

Plaintiff visited Dr. Reid Taylor, a neurologist, on February 19, 1997, having been referred by Dr. Moffitt for evaluation and suggestions for possible rehabilitation that would help her improve her functionality. (R. at 194, 195–98). In his evaluation, Dr. Taylor diagnosed Plaintiff with post-traumatic encephalopathy and noted that she had been having frequent falls Dr. Taylor opined could be a type of seizure. (R. at 197). After reviewing his impression of Plaintiff, Dr. Taylor stated, "In my opinion, [Plaintiff] will never have much more improvement of her mental status and employability will be very difficult for her." (R. at 197).

Plaintiff returned to Dr. Taylor on April 24, 1997. (R. at 193). According to his physician notes, Plaintiff had fallen only once since her last visit and that this fall had been a slip, not a possible atonic seizure. (R. at 193).

On June 25, 1997, Plaintiff saw Dr. Taylor, who stated that Plaintiff had been without seizures for six months. (R. at 192). Plaintiff returned to Dr. Taylor on

August 20, 1997, and Dr. Taylor noted that Plaintiff was doing well and that while Plaintiff had been having almost daily falls, described as "almost losing consciousness," she had not had any since beginning on Tegretol. (R. at 192).

On July 31, 1997, Dr. Jeffrey Wysocki, a state agency psychological consultant, completed an assessment of Plaintiff's psychological condition and found that while Plaintiff had a severe psychological impairment, it was not severe enough to meet or equal an impairment listed in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1. He assessed Plaintiff's impairments under Listing 12.02 concerning organic mental disorders and found, specifically, that Plaintiff suffered from psychological or behavior abnormalities associated with a dysfunction of the brain as evidenced by mood disturbance and a closed head injury. (R. at 214). Dr. Wysocki opined that Plaintiff's impairments resulted in a slight restriction of her activities of daily living and a slight difficulty in maintaining social functioning, while often causing deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner. (R. at 219). With respect to the frequency of episodes of deterioration or decompensation in a work or work-like setting, Dr. Wysocki concluded that Plaintiff had experienced such episodes "once or twice." (R. at 219). In terms of her functional capacity, Dr. Wysocki found Plaintiff to be moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to accept instructions and respond appropriately to criticism, and to respond appropriately to changes in the work setting. (R. at 221–22). In explaining his conclusions, Dr. Wysocki noted that testing on May 13, 1997 revealed memory capability within normal limits with attention and concentration levels within the average range and revealed no significant cognitive defect. (R. at 223). A second state agency psychological consultant, Dr. Clifford Charles, reviewed Dr. Wysocki's assessment, as well as the evidence in Plaintiff's file, and concurred with Dr. Wysocki's conclusions. (R. at 223).

On August 1, 1997, Dr. Sankar Kumar, a state agency consultant, reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity Assessment. (R. at 203–10). Dr. Kumar concluded that Plaintiff could occasionally lift up to fifty pounds; could frequently lift twenty-five pounds; could stand or walk approximately six hours in an eight-hour workday; could sit approximately six hours in an eight-hour workday; and could occasionally climb stairs or a ramp, balance, kneel, or crawl. (R. at 204–05). A second state agency physician, Dr. Joseph Dykes, reviewed Plaintiff's file and Dr. Kumar's report, and signed that he concurred. (R. at 210).

Plaintiff visited Dr. Taylor again on December 31, 1997, and he noted that Plaintiff reported several episodes a day during which her vision would "go out." (R. at 447). In response, Dr. Taylor increased Plaintiff's medication. (R. at 447). On March 4, 1998, Plaintiff returned to Dr. Moffitt, her family physician, who reported that she continued to complain of pain and "peculiar spells of unknown etiology." (R. at 451). Plaintiff then visited Dr. Taylor on April 14, 1998, and his notes indicate that Plaintiff reported that she had not had any more "falling down spells" or "episodes." (R. at 448).

Plaintiff also submitted more recent medical records from Dr. Taylor. According to Dr. Taylor's notes from Plaintiff's visit to him on July 6, 1999, Plaintiff continued to complain of episodes she described as possible seizures. (R. at 498). Specifically, Plaintiff described episodes

during which she would stop talking, look ahead, and had to be interrupted by other people. (R. at 498). While Dr. Taylor opined that he did not believe the episodes to be seizures, he stated, "I don't think that the patient is able to work at all and I don't think that she will ever be able to hold a significant job." (R. at 498). Dr. Taylor noted that his opinion was "in complete opposition" to Dr. Rhodes' report but that he had seen Plaintiff since February of 1997 and felt strongly that she would never be able to work. (R. at 499).

Plaintiff returned to Dr. Taylor on January 27, 2000, who noted that Plaintiff had begun to have "episodes" a couple of times a day during which she would "look down a tunnel." (R. at 499). According to Dr. Taylor, her family described her falling during some of these episodes, and these were occurring despite being on Tegretol. (R. at 499). Dr. Taylor concluded that he still did not think Plaintiff was able to work at all and that while she had had jobs in the past, she could not keep them longer than approximately one month. (R. at 499).

Plaintiff visited Dr. Taylor again on March 10, 2000 and June 6, 2000. (R. at 500). During her March 10, 2000 visit, Plaintiff reported that she was doing well and having very few "falling down spells." (R. at 500). She reported that she continued to have some episodes of falling, as well as one instance when she would not respond to her father and he had to slap her in the face to get her to pay attention. (R. at 500). During the June 6, 2000 visit, Plaintiff reported an episode during which she was found "down and reportedly pulseless." (R. at 501). Plaintiff was taken to the hospital and came around with normal blood levels. (R. at 501). Following this visit, Dr. Taylor noted that Plaintiff continued to have what he believed were a combination of focal and atonic seizures notwithstanding her antiepileptic medication

and that he intended to refer her to an epileptologist. (R. at 501).

On June 29, 2000, Plaintiff visited Dr. Robert Armstrong with Mountain Neurological Center and reported that she continued to have episodes of different types of seizures. (R. at 503). Specifically, Plaintiff reported that she experienced an alteration in consciousness for several minutes at a time and some episodes of hyperventilation, a few of which required visits to the emergency room. (R. at 503–04). Plaintiff also described increasing problems with headaches. (R. at 504). On or about July 5, 2000, Plaintiff underwent an MRI on her brain, which indicated an old hematoma in the right temporal lobe and associated atrophy in the temporal lobe and in the right frontal lobe. (R. at 497).

Plaintiff returned to Dr. Armstrong in July, September, and November of 2000, and reported some significant falls but a generally improved seizure situation. (R. at 507–11). On one occasion, Plaintiff suffered a seizure with convulsions and had to be taken to the emergency room, but she was treated with an increase in medication. (R. at 507–08). An MRI conducted on November 27, 2000 was found to be essentially unchanged from the one taken on July 5, 2000. (R. at 513).

## III.  Standard of Review

The only issues on review are whether the Commissioner applied the correct legal standards and whether the Commissioner's decision is supported by substantial evidence. *See Richardson v. Perales,* 402 U.S. 389, 390, 91 S.Ct. 1420, 1422, 28 L.Ed.2d 842 (1971); *Walls v. Barnhart,* 296 F.3d 287, 290 (4th Cir.2002); *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Review by the undersigned is not *de novo, Smith v. Schweiker,* 795 F.2d 343, 345 (4th Cir.1986); rather, inquiry is limited to whether there was " 'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion,' " *Richardson,* 402 U.S. at 401, 91 S.Ct. at 1427 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Even if the undersigned were to find that a preponderance of the evidence weighed against the Commissioner's decision, the Commissioner's decision would have to be affirmed if supported by substantial evidence. *See Hays,* 907 F.2d at 1456.

## IV. Discussion

### A. Introduction

The undersigned has reviewed the transcript of Plaintiff's administrative hearing, the decision of the ALJ, and the extensive exhibits contained in the administrative record. Having considered the record as set forth above, as well as the parties' legal arguments, the undersigned recommends that the decision of the Commissioner be affirmed and this action dismissed.

### B. Sequential Evaluation

In determining whether a Social Security claimant is disabled, the Commissioner employs a five-step process, known as "sequential" review. The Commissioner evaluates claims for disability insurance benefits or for SSI pursuant to the following five-step analysis:

a. An individual who is working · and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings;

b. An individual who does not have a "severe impairment" will not be found to be disabled;

c. If an individual is not working and is suffering from a severe impairment that meets the durational requirement and that "meets or equals a listed impairment in Appendix 1" of Subpart P of Regulations No. 4, a finding of "disabled" will be made

without consideration of vocational factors;

d. If, upon determining residual functional capacity, the Commissioner finds that an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made;

e. If an individual's residual functional capacity precludes the performance of past work, other factors including age, education, and past work experience, must be considered to determine if other work can be performed.

20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f).

### C. The Administrative Decision

In this case, the ALJ first noted that although Plaintiff had initially alleged an onset date of June 7, 1990, she amended that date to January 1, 1997 at the hearing on May 29, 1998. (R. at 19). The ALJ noted further, for purposes of disability insurance benefits, that Plaintiff remained insured through March 31, 2000. (R. at 20). The ALJ noted that Plaintiff had not engaged in any substantial gainful activity since January 1, 1997, her alleged onset date, and found that Plaintiff suffers from mood disorder, post-traumatic encephalopathy, a history of multiple fractures in her left hand, pelvis, and lumbar spine, and a seizure disorder, which are severe impairments within the meaning of the Social Security Act. (R. at 20–21). The ALJ next concluded that Plaintiff had no impairment which met the criteria of any of the listed impairments contained in the Listing of Impairments. (R. at 21). The ALJ noted specifically that he had evaluated Plaintiff's mood disorder under Section 12.02 of the Listing of Impairments and concluded that her activities of daily living are only slightly limited by her mental impairment, as evidenced by her perform-

ing household chores without limitations and maintaining social functioning with boyfriends and other relationships. (R. at 21). While the ALJ noted that Plaintiff experiences some deficiencies of concentration, persistence, or pace, the ALJ concluded that she has "no 'basic problems with simple attentional abilities' and she has no 'severe deficits in the attention/concentration area.'" (R. at 21 (quoting evaluation of Dr. Rhodes date May 13, 1997)).

The ALJ then considered Plaintiff's residual functional capacity, stating specifically that he had considered her subjective complaints of pain, and concluded that Plaintiff is capable of less than the full range of light work and can lift up to twenty pounds occasionally, lift and carry up to ten pounds frequently, stand and walk approximately six hours during a regular eight-hour workday, perform tasks which require only brief, superficial contact with the public, work in environments that do not involve exposure to unprotected heights or dangerous moving machinery, and perform tasks which do not require fine manipulation with the left hand. (R. at 22). The ALJ noted that Plaintiff also requires a sit/stand option occasionally. (R. at 22). With respect to Plaintiff's alleged seizures, the ALJ noted that EEG tests had indicated a right focal slowing but found that the medical records did not support Plaintiff's mother's testimony that Plaintiff has "spells" at least once a day when she becomes "unfocused" and falls. (R. at 23). Specifically, the ALJ noted that Plaintiff's neurologist reported that her seizures were well controlled and were "down to none" and that while Plaintiff had described feeling that her vision would "go out," her eye examinations had revealed no ocular abnormalities. (R. at 23 (quoting office notes from Dr. Reid Taylor dated April 14, 1998 at R. at 448)). The ALJ also noted that he considered the opinions of two state agency physicians who reviewed Plaintiff's medical records and concluded that she was capable of a reduced range of medium work, and the ALJ relied particularly on the neuropsychological examination performed by Dr. Rhodes on May 13, 1997, in which Dr. Rhodes described Plaintiff as performing within the average range of general intellectual functioning and well within normal limits in memory skills testing. (R. at 23–24).

Concerning Plaintiff's psychological impairments, the ALJ noted that records from Plaintiff's counseling sessions discussed most frequently issues with boyfriends and that Dr. Wysocki and Dr. Charles, state agency psychological consultants, believed Plaintiff to be capable of performing work activity, notwithstanding her mood disorder. (R. at 24–25). The ALJ also found that Plaintiff's testimony concerning her impairments was not entirely credible based on the inconsistency between her statements and the evidence that she performed household chores without limitation, was independent in her self-care, and that her seizures had been well controlled by medication. (R. at 25).

The ALJ found that Plaintiff was unable to perform her past relevant work but based on the testimony of the vocational expert, was able to perform jobs which exist in significant numbers in the national economy, including clerical, bench pack worker, and grader/sorter/inspector positions. (R. at 26). The ALJ concluded, therefore, that Plaintiff was not disabled and was not entitled to either disability insurance benefits or supplemental security income benefits. (R. at 26).

### D.  Plaintiff's Assignments of Error

#### 1.  Listing 12.08

Plaintiff first asserts that the ALJ erred in failing to find that Plaintiff met the impairment at Listing 12.08 for personality disorders, instead assessing Plain-

tiff's mental illness only under Listing 12.02 for organic mental disorders. As support, Plaintiff notes that her mental health treatment records are filled with references to maladaptive behavior, including Plaintiff's inability to sustain personal and social relationships and tendency to engage in damaging and impulsive behavior. Plaintiff also relies on Social Security Ruling 85–16.

With respect to Listing 12.08, while Plaintiff is correct that her mental health records reveal that she made poor decisions in her relationships and that her therapists were concerned about her apparent inability to make healthy choices in that regard, Plaintiff has cited no evidence that any mental health professional diagnosed her with a personality disorder that would constitute an impairment under Listing 12.08. Additionally, neither consultative psychologist found Plaintiff to suffer from an impairment meeting the definition under Listing 12.08. With respect to Social Securing Ruling 85–16, the Court agrees with Plaintiff, as set forth below, that the ALJ in this case did not adequately assess the factors set forth in Social Security Ruling 85–16 in evaluating Plaintiff's residual functional capacity. However, Ruling 85–16 provides guidance in making the residual functional capacity determination where the claimant's impairment does *not* meet or equal a listed impairment. *See* SSR 85–16 ("This policy statement provides guides for the determination of [residual functional capacity] for individuals whose mental impairment(s) does not meet or equal the listing, but is more than not severe."). It is not the appropriate point of reference where a claimant does meet a listed impairment, as Plaintiff argues here, and does not, therefore, assist in determining whether the ALJ's decision that Plaintiff's impairment did not meet a listed impairment was supported by substantial evidence. In sum, while the mental health records evidence what might be considered a personality disorder, the ALJ's decision that Plaintiff did not have a mental impairment sufficient to meet Listing 12.08 was supported by substantial evidence.

## 2. Appeals Council

■ Plaintiff next argues that the Appeals Council erred in determining that there was no basis for review of the ALJ's decision. Specifically, Plaintiff asserts that the new evidence of record, covering physician visits and tests from July 5, 2000 through November 27, 2000, established that the ALJ's decision was contrary to the weight of the evidence. *See* 20 C.F.R. § 404.970(b).

Under 20 C.F.R. § 404.970, the Appeals Council is to review a case if: (1) there appears to be an abuse of discretion by the ALJ; (2) there is an error of law; (3) the action, findings or conclusions of the ALJ are not supported by substantial evidence; or (4) there is a broad policy or procedural issue that may affect the general public interest. *See* 20 C.F.R. § 404.970(a). Additionally, where new and material evidence is submitted that relates to the period on or before the date of the ALJ's decision, the Appeals Council is to review the case "if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record." *See id.* § 404.970(b). Under subsection (a) of § 404.970, then, the Appeals Council conducts, at least in part, the same review a court conducts in determining whether the ALJ erred as a matter of law or whether the ALJ's decision is supported by substantial evidence. As set forth in more detail below, the Court agrees with Plaintiff that the ALJ erred in this case by failing to consider, or at least explain, significant evidence in Plaintiff's favor, warranting remand. Because the Court holds that remand is necessary and remand will

require that the Commissioner re-weigh the evidence, it is unnecessary to decide whether the evidence presented, for the first time, to the Appeals Council required that it review the ALJ's decision as contrary to the weight of the evidence. The Court notes, however, that on remand, the Commissioner should consider this evidence, as it appears relevant, it appears to relate to the time period at issue in this case, and it was presented to the Appeals Council before its final decision.

### 3. Substantial Evidence

█ Finally, Plaintiff argues that the ALJ's conclusion that there were available jobs in the national economy that Plaintiff could perform was not supported by substantial evidence. As set forth above, an ALJ's decision that becomes the Commissioner's final decision is to be affirmed if supported by substantial evidence defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson,* 402 U.S. at 401, 91 S.Ct. at 1427 (quoting *Consolidated Edison Co.,* 305 U.S. at 229, 59 S.Ct. at 217). In order to facilitate review of an ALJ's decision, an ALJ has a duty to explain the weight given to all of the relevant evidence. *See Gordon v. Schweiker,* 725 F.2d 231, 235 (4th Cir.1984) ("We cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence."); *see also* 42 U.S.C. § 405(b)(1) (discussing duty of explanation under Social Security Act); 5 U.S.C. § 557(c)(3)(A) (duty of explanation under Administrative Procedure Act). Thus, while "the reviewing court should not 'undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of' the agency," *Walls,* 296 F.3d at 290 (quoting *Mastro v. Apfel,* 270 F.3d 171, 176 (4th Cir.2001) (brackets in original) (internal quotation marks omitted)), in explaining his credibility determinations, an ALJ should "refer specifically to the evidence informing his conclusion," *Hammond v. Heckler,* 765 F.2d 424, 426 (4th Cir.1985). Where an ALJ fails to discuss relevant evidence that weighs against his decision, remand is appropriate. *See, e.g., Murphy v. Bowen,* 810 F.2d 433, 438 (4th Cir.1987) (remanding ALJ's decision where ALJ left "unresolved conflicts in the evidence"); *Gordon,* 725 F.2d at 236 (remanding case where Secretary failed to indicate weight given to various medical reports); *see also Bill Branch Coal Corp. v. Sparks,* 213 F.3d 186, 191 (4th Cir.2000) (noting ALJ's duty to analyze all relevant evidence and provide sufficient explanation for rationale in crediting evidence and remanding to enable ALJ "to better explain her rationale so that [the court is] not left in the difficult position of attempting to review her factual findings without any understanding of how she reached them").

In this case, the ALJ failed to explain much of the reasoning for his credibility decisions. For example, while he stated that he had considered Plaintiff's subjective complaints of pain and nevertheless found that she could stand and walk approximately six hours during an eight-hour workday with a stand/sit option occasionally, the ALJ did not explain why he rejected her testimony that she could not walk longer than approximately ten minutes without sitting down or bending forward to relieve her back pain, that she could stand on a flat surface only five minutes before changing position, and that she could sit only approximately fifteen to twenty minutes. This testimony was consistent with other descriptions Plaintiff provided of her pain and with the report of a field office representative who described Plaintiff's needing to change positions frequently during an interview. While there may be legitimate reasons for rejecting Plaintiff's

testimony on this issue, the Commissioner must, at the least, articulate those reasons.

The ALJ also failed to explain why he chose to credit so much of Dr. Rhodes' evaluation of Plaintiff's intellectual and mental capacity, while apparently rejecting the portion of Dr. Rhodes' evaluation in which he described Plaintiff as having "problems that would significantly impair functional abilities with sustained effort and speed of processing" and which could "put many individuals at a loss and result in undue confusion and frustration on relatively simple tasks." (R. at 168–69). When questioned at the hearing on Plaintiff's disability application, Mr. Adams, the vocational expert, testified that if Plaintiff experienced undue confusion and frustration even on relatively simple tasks, as described by Dr. Rhodes in this section of the report, there would be no jobs available which Plaintiff could perform. Nevertheless, while quoting Dr. Rhodes to support his decision, he apparently and without explanation chose not to credit Dr. Rhodes' assessment on this issue.

In this same vein, the ALJ failed to discuss Plaintiff's history of employment that is littered with short-term jobs and would suggest an inability to maintain long-term employment and Plaintiff's mother's testimony as to her own experience witnessing her daughter's inability to follow even simple tasks at the plant where both were employed for a time. *See* SSR 85–16 (in assessing a claimant's residual functional capacity and ability to function in a competitive work environment, where there is evidence of a mental impairment, ALJ should consider information obtained from third party sources, such as previous employers and family members, and

should consider claimant's performance in any work setting, as well as circumstances surrounding termination of work effort).[1] Indeed, in the Psychiatric Review Technique Form attached to his decision, the ALJ represented that there was insufficient evidence to determine the frequency with which Plaintiff would experience episodes of deterioration or decompensation in work or work-like settings which cause the withdrawal from work. As the decision-maker, the ALJ was vested with the responsibility to obtain as much information as possible as to the severity of Plaintiff's impairment and her residual functional capacity, *see id.*, yet in this case, the ALJ appeared both to reject evidence suggesting that Plaintiff frequently found it impossible to maintain employment and to conclude that there was insufficient evidence as to how frequently Plaintiff would withdraw from a work setting because of her impairment. As with his decision not to credit Plaintiff's subjective complaints of back pain, the ALJ must explain his decision not to credit the portion of Dr. Rhodes' evaluation suggesting a limited functional capacity and must address other evidence, including her work history and testimonial evidence suggesting that Plaintiff was unable to maintain employment.

Finally, with respect to the ALJ's judgment as to Plaintiff's ability to obtain and maintain employment, the Court notes two instances in which the ALJ's representation of the evidence was not entirely accurate. First, the ALJ rejected Plaintiff's subjective complaints of pain, in part, because of her ability to "perform[ ] household chores without any limitations." (R. at 25). In fact, Plaintiff did not testify that she performs household chores with

---

1. The Court notes that this case is not one in which the claimant has failed to make an effort to obtain gainful employment. Rather, the evidence makes clear that Plaintiff completed more than one academic program in an effort to identify a career that she would be able to perform, yet failed to sustain employment in any of the positions she attempted.

no limitation, but rather, testified that while she is able to make her own bed, wash dishes, and do laundry, she is unable to sweep or vacuum. Additionally, she noted elsewhere in the record that she is able to cook only simple meals and that her mother pays her bills for her. Accordingly, while Plaintiff is able to conduct some activities of daily living, she testified that she is not able to do so without limitation, as stated by the ALJ. Second, the ALJ found that Plaintiff's mental impairment was not sufficiently severe to meet or equal a listing or to prevent her from being able to engage in gainful activity because the record reflected that she was able to maintain relationships with boyfriends and because she spent most of her therapy sessions talking about her boyfriend problems. While it is true that Plaintiff maintained relationships with men, it is also apparent from the record that her therapists considered these relationships to be harmful to her and representative of Plaintiff's inability to make healthy decisions and exercise good judgment. These relationships may not evidence an inability to engage in substantial work activity, but to suggest that they evidence an ability to engage in socially appropriate interaction is also not accurate.

### 4. Plaintiff's New Evidence

■ As her final assignment of error, Plaintiff argues that evidence that she attached to her memorandum in support of summary judgment—to wit, deposition testimony from Dr. Taylor and an evaluation conducted by Dr. Alexander Manning, a neuropsychologist, on September 14, 2001—establishes that the ALJ erred and warrants remand. Under the sixth sentence of 42 U.S.C. § 405(g), the court may order additional evidence to be taken before the Commissioner "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Fourth Circuit has held that evidence is new if it "is not duplicative or cumulative" and is material "if there is a reasonable possibility that the new evidence would have changed the outcome." *Wilkins v. Secretary, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir.1991). In this case, the deposition testimony of Dr. Taylor is neither new nor material in that the import of what he states in his deposition is contained in earlier medical reports, submitted in this case to the Appeals Council, and it is not evidence, therefore, that creates a "reasonable possibility" of a different outcome. *See Wilkins*, 953 F.2d at 96. The evaluation conducted by Dr. Manning is new; however, because it relates to testing performed approximately three years after the ALJ's final decision in this case, it is not sufficiently relevant or material to Plaintiff's claim for disability benefits beginning January 1, 1997 to warrant a remand for reconsideration of this evidence under § 405(g). Accordingly, the Court will decline to require that the Commissioner consider this new evidence upon remand.

### V. Conclusion

The undersigned has carefully reviewed the decision of the ALJ, the record, and the parties' briefs and has concluded that the ALJ failed adequately to explain the reasons for his credibility determinations or to consider all relevant evidence. The parties' cross-motions will, therefore, be denied, and the matter will be remanded pursuant to 42 U.S.C. § 405(g) for reconsideration by the Commissioner consistent with this opinion. The Court notes that it has not attempted to identify each piece of relevant evidence either not considered or rejected without sufficient explanation by the ALJ. On remand, then, the Commissioner should review all relevant evidence,

including that submitted following the initial hearing but before the Appeals Council rendered its decision, in reaching a determination as to Plaintiff's eligibility for benefits. A judgment will be entered contemporaneously herewith.